## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Matthew J. Christoff,                                        Case No. 17-cv-3515 (JRT/TNL)

        Plaintiff,

                                      **REPORT &**

v.                                                          **RECOMMENDATION**

Paul Revere Life Insurance Company,
The,

        Defendant.

---

Mark M. Nolan and Robert J. Leighton, Jr., Nolan, Thompson & Leighton, 5001 American Boulevard West, Suite 595, Bloomington, MN 55437 (for Plaintiff); and

Christopher J. Haugen and Terrance J. Wagener, Messerli & Kramer P.A., 100 South Fifth Street, 1400 Fifth Street Towers, Minneapolis, MN 55402 (for Defendant).

---

## I. INTRODUCTION

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant The Paul Revere Life Insurance Company's ("Paul Revere") Motion for Summary Judgment (ECF No. 9) and Plaintiff Matthew J. Christoff's Motion for Partial Summary Judgment (ECF No. 22). These motions have been referred to the undersigned for a report and recommendation to the district court, the Honorable John R. Tunheim, Chief District Judge for the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1. (ECF No. 31.)

A hearing was held on May 3, 2018. (ECF No. 39.) Attorney Mark M. Nolan appeared on behalf of Christoff and attorney Terrance J. Wagener appeared on behalf of

Paul Revere. For the reasons stated below, the Court recommends that Paul Revere's motion for summary judgment **BE DENIED** and Christoff's motion for partial summary judgment **BE DENIED IN PART** and **GRANTED IN PART**.

## II. BACKGROUND

In 1998, Christoff worked for Spencer Stuart. Spencer Stuart offered its employees long-term disability coverage under a group policy. (Aff. of Janeen Frank ¶ 2, ECF No. 26; *see* Application at 1, ECF No. 25-2.[1]) Christoff participated in this group policy.

At some point, Spencer Stuart decided to augment this group policy with individual disability policies. (*See* Ex. A to Decl. of Dawn Mugford, ECF No. 29-1.[2]) In 1998, Spencer Stuart allowed Paul Revere to offer individual supplemental disability policies to its employees. (Frank Aff. ¶ 3.) Purchase of these individual polices was completely voluntary. (Frank Aff. ¶ 5.) Christoff applied for, and was issued, an individual policy ("the Policy"). (Aff. of Dawn Mugford ¶ 3, ECF No. 12[3]; *see generally* Application;

---

[1] The administrative record in this matter was filed under seal. (*See* ECF Nos. 13-18.) Some of the relevant documents were filed by Christoff in redacted form. (*See* ECF Nos. 25 through 25-3.) None of the briefing was filed under seal. Where possible, the Court has cited to the redacted documents. When necessary to cite to sealed documents, the Court has not revealed information that was not already discussed in the parties' publicly filed briefs.

[2] *See infra* n.3.

[3] There are two preliminary matters to address with respect to the Mugford Affidavit. First, Christoff objected to the Mugford Affidavit as "irrelevant and/or inadmissible" because "Mugford does not allege that she is familiar with the practices of Paul Revere in 1998, which is the relevant time period." (Pl.'s Mem. in Supp. at 15, ECF No. 24.) Under Rule 56(c), "[a]n affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). In her affidavit, Mugford avers that she is "familiar with the processes and requirements surrounding the issuance of individual disability policies" and the "affidavit is based upon [her] own personal knowledge and [her] review and inspection of records maintained by Paul Revere in the regular course of business." (Mugford Aff. ¶¶ 1-2.) The Court concludes that this is sufficient to demonstrate personal knowledge and relevance. *See Henderson v. Paul Revere Life Ins. Co.*, No. 3:11-CV-1992-D, 2013 WL 1875151, at *3 (N.D. Tex. May 6, 2013) (denying motion to strike declaration for lack of personal knowledge where affiant "aver[red] that she reviewed the files, is aware of their contents, and has knowledge of the facts stated in her declaration"); *see also D'Elia v. Unum Life Ins. Co. of Am.*, 223 F. Supp.3d 380, 387 n.38 (E.D. Penn. 2016).

Policy, ECF No. 25-1.)  The application indicated that the requested coverage would be paid "100%" by the employer.  (Application at 1; *see also* Mugford Aff. ¶ 4; Policy Coverage Summary, PRL-CL-IDI-000802, ECF No. 14 at 847.)  When the employer paid "100%," the application provided that "the decisions involving payment of premium will be made by the employer."  (Application at 2.)  The application also indicated that notices regarding the Policy should be sent to the "[b]usiness" address.  (Application at 1; *see* also Mugford Aff. ¶ 4.)

Paul Revere issued the Policy as part of an "employer sponsored or security plan," known as an "ESP," and assigned a group number.  (Mugford Aff. ¶ 5; Application at 2; *see* Policy Coverage Summary.)  "Paul Revere made ESPs available to employers who wished to insure/provide supplemental coverage to multiple employees through individual policies."  (Mugford Aff. ¶ 5.)  Paul Revere provided a 35% multi-life discount on premiums to policies in this group.  (Mugford Aff. ¶ 5; Application at 2; *see* Waiver Termination, PRL-CL-IDI-002640, ECF No. 16 at 780.)  Over 80 individual polices were issued under this group number, and at least 40 individual polices were issued the same year as the Policy.  (Mugford Aff. ¶ 5.)

---

Second, Christoff objected to the documents attached to the Mugford Affidavit, but not identified therein. These documents appear to be proposal-related documents between an insurance agent and an insurance company regarding supplemental disability coverage for Spencer Stuart.  At the hearing, the Court asked about these documents.  Counsel for Paul Revere was not aware as to why Mugford had included the documents and agreed that they were not identified in the affidavit.  Christoff objected to the Court's consideration of the unidentified documents and the Court determined that the unreferenced documents would not be considered.

Mugford submitted both an affidavit and a declaration.  The Court notes that no challenges were raised to the Mugford Declaration.  (*See generally* Pl.'s Reply, ECF No. 30.)

Spencer Stuart facilitated and administered billing for those employees that purchased Paul Revere policies, deducting premiums from the employees' earnings and remitting them to Paul Revere. (Frank Aff. ¶ 4; *see* PRL-CL-IDI-002620, ECF No. 16 at 760 ("BILL METHOD: SEL ESP").) According to Spencer Stuart's benefits and compensation director, "the employees paid 100% of the premiums for the individual policies with after-tax dollars; Spencer Stuart did not pay any portion of the premiums for the individual policies." (Frank Aff. ¶ 4.) For purposes of the instant motions, counsel for Paul Revere stated that there is nothing in the record to refute Christoff's allegation that he in fact paid all of the premiums for the Policy.

Spencer Stuart "never received any compensation from Paul Revere for allowing it to offer the individual . . . policies to its employees." (Frank Aff. ¶ 4.) Spencer Stuart was also "not involved in claims administration for the individual Paul Revere polices; employees completed Paul Revere forms and submitted claims to Paul Revere, not Spencer Stuart." (Frank Aff. ¶ 9.)

In 2001, Christoff became disabled under the Policy. Paul Revere provided disability benefits to Christoff under the Policy for over 15 years. In 2016, Paul Revere terminated benefits on grounds that Christoff was no longer disabled. Christoff then brought the instant action, challenging the termination of benefits.

### III. ANALYSIS

Paul Revere and Christoff have brought cross-motions for summary judgment on whether the Policy at issue is an employee welfare benefit plan under the Employee

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and the preemption of Christoff's state-law claims thereunder.[4]

### A. Summary Judgment

Under Rule 56, courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see* Fed. R. Civ. P. 56(c)(1)(A), (3); *Pena v. Kindler*, 187 F. Supp. 3d 1070, 1076 (D. Minn. 2016) ("A party asserting that a genuine dispute exists—or cannot exist—about a material fact must cite particular parts of materials in the record." (quotation omitted)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party." *Pena*, 187 F. Supp. 3d at 1076 (citing *Anderson*, 477 U.S. at 252). "On a motion for summary judgment, the court views all evidence and inferences in a light most favorable to the nonmoving party." *Id.* (citing *Anderson*, 477 U.S. at 255).

"To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue for trial."

---

[4] Paul Revere's motion consisted of two parts—the first addressed the applicability of ERISA and the second addressed the merits of Christoff's claims under ERISA. Paul Revere subsequently withdrew the merits portion in a letter to the Court. (ECF No. 20.)

*Davenport v. Univ. of Ark. Bd. of Trustees*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477 U.S. at 247-49); *see also Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) ("The nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986))). "[T]here is no genuine issue for trial if 'the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party.'" *Ball v. City of Lincoln*, 870 F.3d 722, 727 (8th Cir. 2017) (quoting *Torgerson*, 643 F.3d at 1042).

## B. ERISA

"ERISA is a 'comprehensive legislative scheme' that includes 'an integrated system of procedures for enforcement' that are 'essential to accomplish Congress' purpose of creating a comprehensive statute for the regulation of employee benefit plans.'" *Dakotas & W. Minn. Elec. Indus. Health & Welfare Fund v. First Agency, Inc.*, 865 F.3d 1098, 1101 (8th Cir. 2017) (quoting *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004)) [hereinafter *Dakotas & W. Minn.*]. "ERISA supersedes any and all State laws that relate to any employee benefit plan." *Eide v. Grey Fox Tech. Servs. Corp.*, 329 F.3d 600, 604 (8th Cir. 2003) (quotation omitted); *see* 29 U.S.C. § 1144(a). "ERISA, therefore, preempts state common law causes of action that reference or pertain to an ERISA plan." *Eide*, 329 F.3d at 604; *accord Moore v. Apple Central, LLC*, 893 F.3d 573, 576 (8th Cir. 2018) ("ERISA preempts state common law tort and contract actions asserting improper processing of a claim for benefits under an ERISA plan." (quotation omitted)); *Dakotas & W. Minn.*, 865

6

F.3d at 1101 ("Any state-law cause of action that duplicates, supplements, or supplants the

ERISA civil enforcement remedy is therefore preempted." (quotation omitted)).  "If the

essence of a state law claim relates to the administration of plan benefits, it falls within the

scope of ERISA."  *Moore*, 893 F.3d at 576.  Christoff alleges that Paul Revere breached

the insurance contract when it terminated his benefits under the Policy.  Accordingly, if the

Policy falls under ERISA, Christoff's breach-of-contract claim is preempted.

> Under ERISA, an employee welfare benefit plan is defined as

> > any plan, fund, or program . . . established or maintained by an employer or by an employee organization, or by both, . . . for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, . . . medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, *disability*, death or unemployment.

29 U.S.C. § 1002(1) (emphasis added).  "A plan is established for ERISA purposes when

a reasonable person can ascertain (1) the intended benefits, (2) the class of beneficiaries,

(3) a source of funding, and (4) the procedures for receiving benefits."  *Petersen v. E.F.

Johnson Co.*, 366 F.3d 676, 678 (8th Cir. 2004); *accord Ibson v. United Healthcare Servs.,

Inc.*, 776 F.3d 941, 944 (8th Cir. 2014); *Johnston v. Paul Revere Life Ins. Co.*, 241 F.3d

623, 629 (8th Cir. 2001.)

> Yet, "[a]n employer's decision to extend benefits does not constitute, in and of itself,

the establishment of an ERISA plan."  *Kulinski v. Medtronic Bio-Medicus, Inc.*, 21 F.3d

254, 256 (8th Cir. 1994); *accord Eide*, 329 F.3d at 605 ("An arrangement to provide

benefits to employees does not invoke ERISA's protections solely because it delivers

benefits . . . .").  "[A]n ERISA plan must embody a 'set of administrative practices.'"

*Johnston*, 241 F.3d at 629 (quoting *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 11-12 (1987)). "The existence of an ERISA plan is a mixed question of fact and law . . . ." *Kulinski*, 21 F.3d at 256; *accord House v. Am. United Life Ins. Co.*, 499 F.3d 443, 449 (5th Cir. 2007); *Boles v. UNUM Life Ins. Co. of Am.*, 847 F. Supp. 2d 1161, 1165 (D. Neb. 2012).

### 1. Safe Harbor

"Certain group or group-type insurance plans offered by an insurer to employees are explicitly exempted from ERISA governance under the safe harbor provision." *Ibson*, 776 F.3d at 944 (citing 29 C.F.R. § 2510.3-1(j)); *see Dam v. Life Ins. Co. of N. Am.*, 206 F. App'x 626, 626 n.2 (8th Cir. 2006) (per curiam). Under the safe harbor of 29 C.F.R. § 2510.3-1(j), "a group or group-type insurance program offered by an insurer to employees or members of an employee organization" does not constitute an employee welfare benefit plan for purposes of ERISA if:

> (1) No contributions are made by an employer or employee organization;
>
> (2) Participation [in] the program is completely voluntary for employees or members;
>
> (3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and
>
> (4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually

rendered in connection with payroll deductions or dues checkoffs.

All four elements must be present to qualify for the safe-harbor exemption. *Ibson*, 776 F.3d at 945 (citing *Dam*, 206 F. App'x at 627)); *see, e.g.*, *Shaw v. Prudential Ins. Co. of Am.*, No. 10-3355-S-CV-DGK, 2012 WL 432874, at *5 (W.D. Mo. Feb. 9, 2012) ("These requirements are strict, and failure to meet one renders the Safe Harbor exception inapplicable.").

The parties' arguments are directed at the first and third elements: contribution and endorsement.  Paul Revere argues that the Policy does not come within the safe-harbor exemption because Spencer Stuart contributed to and endorsed the policy based on "assum[ing] 100% responsibility for paying the premiums" and "secur[ing] a 35% premium discount."  (Def.'s Mem. in Supp. at 10, ECF No. 11.)  Christoff counters that "the mere fact of a discount" does not equate to contribution for purposes of the safe-harbor exemption and Spencer Stuart did not endorse the Policy.  (Pl.'s Mem. in Supp. at 8.)

### a.  Contribution

Paul Revere argues that Spencer Stuart contributed to the Policy by obtaining a 35% discount on the premiums that Christoff would not have been able to obtain on his own. According to Paul Revere, "where an employer provides its employees with a premium discount they would not have otherwise received as individuals, it has 'contributed' to an ERISA plan under the plain and ordinary meaning of that term."  (Def.'s Reply at 6, ECF No. 28.)  Christoff responds "that the safe harbor 'contribution' language applies only to a financial contribution, where the employer pays all or a part of the premiums on the

employees' behalf." (Pl.'s Mem. in Supp. at 8.) Christoff contends that "a de minimis contribution such as a premium discount does not take the insurance policy out of the safe harbor protections." (Pl.'s Mem. in Supp. at 11.)

"A number of courts have held that an employer's payment of insurance premiums, standing alone, is substantial evidence of the existence of an ERISA plan." *Robinson v. Linomaz*, 58 F.3d 365, 368 (8th Cir. 1995). While Paul Revere emphasizes that the application stated that Spencer Stuart would be solely responsible for payment of the Policy's premiums, the undisputed evidence in the record is that Christoff in fact paid all of the premiums. This fact distinguishes the present case from those situations in which the employer paid some portion of the premium. *See Gooden v. Unum Life Ins. Co. of Am.*, 181 F. Supp. 3d 465, 474 (E.D. Tenn. 2016) (listing cases where, in addition to existence of premium discount, "employer paid a portion of the premiums—an indisputable contribution under the safe harbor"); *see, e.g.*, *Boles*, 847 F. Supp. 2d at 1165-67.

The question therefore is whether the fact of the 35% group discount here qualifies as a contribution. Each party has marshalled substantial authority in its favor, although none of it binding. Courts around the nation have considered whether a group discount constitutes a "contribution" for purposes of the safe-harbor exemption with conflicting results. *See, e.g.*, *Gooden*, 181 F. Supp. 3d at 472 ("A number of courts in this and other circumstances have . . . [addressed whether a group discount constitutes a 'contribution' under the first safe-harbor criterion], reaching inconsistent results."); *Weimer v. Unum Life Ins. Co. of Am.*, No. 13-14352-CIV-GRAHAM/LYNCH, 2014 WL 12519755, at *2 (S.D. Fla. Feb. 18, 2014) (noting absence of appellate precedent from the Eleventh and Third

Circuit Courts of Appeal and, "[n]aturally, this dearth of binding precedent has caused conflicting decisions among district courts confronted with the issue of whether the definition of 'contribution' includes premium discounts"); *Healy v. Minn. Life Ins. Co.*, No. 11-CV-00659-DGK, 2012 WL 566759, at *5 (W.D. Mo. Feb. 21, 2012) ("Courts are divided on the issue of whether the Safe Harbor provision applies if a discount is given as a result of the employer's involvement.").

"A number of cases have discussed whether a premium discount negotiated by an employer, either alone or in conjunction with other factors, constitutes a contribution under the safe harbor." *Gooden*, 181 F. Supp. 3d at 473; *see, e.g.*, *House*, 499 F.3d at 449 ("[W]hile the partners paid their own premiums for the optional disability coverage, they benefitted from the unitary rate structure the firm was able to negotiate by bargaining for disability coverage as a package for all classes. The partners therefore effectively received a premium discount or constructive contribution from the firm."); *Moore v. Life Ins. Co. of N. Am.*, 708 F. Supp. 2d 597, 607 (N.D. W.V. 2010) ("While the plaintiff paid his own premiums for the AD & D coverage, he 'benefitted from the unitary rate structure [American Airlines] was able to negotiate by bargaining' for the coverage. Thus the employees 'effectively received a premium discount or constructive contribution from [American Airlines].'" (alteration in original) (citation omitted) (quoting *House*, 499 F.3d at 449)), *aff'd*, 439 F. App'x 245 (4th Cir. 2011) (per curiam). Here, the Mugford Affidavit, which discusses the application of a 35% premium discount to policies in the same group number as the Policy, is silent as to the reason for the discount. (*See* Mugford Aff. ¶ 5.) Paul Revere has not pointed to any evidence in the record that the 35% discount was

specifically negotiated by Spencer Stuart for the benefit of its employees. Similarly, Christoff has not pointed to evidence in the record that the 35% discount was simply unilaterally applied by Paul Revere.

Paul Revere asserts that Spencer Stuart secured a 35% premium discount because it agreed to be 100% responsible for the premiums. But, Paul Revere has not pointed to any evidence in the record to support this assertion. Again, the Mugford Affidavit is silent as to the reason for the discount.

Moreover, the Mugford Affidavit references Christoff's application, wherein the 35% discount is listed as being due to "Multi life (or large case)." (Application at 2.) A reasonable inference to be drawn from this evidence is that the discount was attributable to the fact that there was more than one individual/"life" in the group rather than on account of any act by Spencer Stuart. Indeed, counsel for Spencer Stuart argued as much at the hearing. Accordingly, this case is also distinguishable from those cases in which "a discount [was] extended by the insurer to the insured on the basis of the employer's agreement to be billed for and pay the premiums on behalf of their employees." *Zide v. Provident Life & Accident Ins. Co.*, No. SACV 10-00393-JVS (CWx), 2011 WL 12566818, at *7 (C.D. Cal. Apr. 13, 2011) (concluding discount offered by insurer as a result of employer's action was contribution as employees received benefit they would not have otherwise received but for employer); *see also D'Elia*, 223 F. Supp. 3d at 387-88 (employee received group premium discounts as a result of employer's involvement with group billing); *Healy*, 2012 WL 566759, at *5 (10% discount employee received by virtue of employer's agreement to transmit premium payments constituted contribution).

There is authority for the proposition that "[w]here an employer provides its employees benefits they can not [sic] receive as individuals, it has contributed to an ERISA plan." *Brown v. Paul Revere Life Ins. Co.*, No. CIV. A. 01-1931, 2002 WL 1019021, at *7 (E.D. Penn. May 20, 2002); *see, e.g.*, *Henderson*, 2013 WL 1875151, at *9 ("conclud[ing] as a matter of law that the 15% discount applied to the Paul Revere Policy by virtue of the policy's being list-billed and included in [the employer's] ESP is a 'contribution' for purposes of removing the policy from the Safe Harbor provision of 29 C.F.R. § 2510.3-1(j)"); *Harding v. Provident Life & Accident Ins. Co.*, 809 F. Supp. 2d 403, 417-18 (W.D. Penn. 2011) (contribution found where employees who purchased polices were given 20% discount on premiums "by virtue of their participation in a group" and discount was only available because insured worked for employer and was a member of employer's risk group).

There is also, however, considerable authority to the contrary. *See, e.g.*, *Gooden*, 181 F. Supp. 3d at 471-75; *Rosen v. Provident Life & Accident Ins. Co.*, No. 2:14-cv-0922-WMA, 2015 WL 260839, at *11-12 (N.D. Ala. Jan. 21, 2015); *Tomes v. Prof'l Ins. Co.*, No. 5:13-cv-02061-SVW-DTBx, 2014 WL 2690938, at *3-4 (C.D. Cal. June 11, 2014); *Weimer*, 2014 WL 12519755, at *2-3; *Letner v. Unum Life Ins. Co. of Am.*, 203 F. Supp. 2d 1291, 1300-01 (N.D. Fla. 2001).

Viewed as a whole, the conflicting authority demonstrates that the question of employer contribution for purposes of 29 C.F.R. § 2510.3-1(j)(1) is a very fact-specific inquiry. Based on the record before the Court, the reason for the 35% discount applied to the Policy is an open fact question. Therefore, the Court concludes that neither party is

13

entitled to summary judgment on whether Spencer Stuart contributed to the Policy, and both motions should be denied in this respect.

### b. Endorsement

The third safe-harbor element is satisfied if "[t]he sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer." 20 C.F.R. § 2510.3-1(j)(3). "Courts applying the safe harbor exception have emphasized that employers can only assume a very limited role with respect to the plan if the third prong is to be satisfied." *Casselman v. Am. Family Life Assurance Co. of Columbus*, 143 F. App'x 507, 509 (4th Cir. 2005); *see Butero v. Royal Maccabees Life Ins*. Co., 174 F.3d 1207, 1213 (11th Cir. 1999) ("The regulation explicitly obliges the employer who seeks its safe harbor to refrain from *any* functions other than permitting the insurer to publicize the program and collecting premiums.").

"Endorsement . . . requires more than merely recommending a program." *Gooden*, 181 F. Supp. 3d at 475-76. "[C]ourts have held that an employer will be found to have endorsed an insurance program if the employer plays a significant role in plan administration." *Tomes*, 2014 WL 2690938, at *5; *see, e.g.*, *House*, 499 F.3d at 447 ("Under the group policy, the firm undertook responsibility for certain administrative tasks including determining eligibility for participation, enrollment of participants, calculation of premiums, and payment of premiums."); *Butero*, 174 F.3d at 1213-14 (employer "picked the insurer; it decided on key terms such as portability and the amount of coverage; it

14

deemed certain employees ineligible to participate; it incorporated the policy terms into the self-described plan description for its cafeteria plan; and it retained the power to alter compensation reduction for tax purposes" (footnote omitted)); *Shaw*, 2012 WL 432874, at *6 (employer "is the named plan Administrator, with responsibility for providing participants with claim forms and plan documents and for the daily administration of the plan" as well as "the named 'plan sponsor' with authority under the plan to amend its terms or terminate the programs" and the "agent for service of process for claims arising under and against the plan"); *Moore*, 708 F. Supp.2d at 608 ("American Airlines performed more than mere administrative tasks by drafting documents and distributing them to each plan participant, determining which classes of employees would be eligible for AD & D benefits, negotiating a unitary rate structure, allowing pre-tax payment of premiums, and including AD & D benefits among the benefits provided by the plan.").

"Courts have also held that an employer endorses a benefits plan where the employer goes beyond permitting the insurer to publicize the plan, and instead promotes the plan." *Tomes*, 2014 WL 2690938, at *5; *see, e.g.*, *McCann v. Unum Provident*, 921 F. Supp. 2d 353, 368 (D. N.J. 2013) (agreements repeatedly executed by employee and employer stating that employer would provide disability insurance along with marketing materials stating that employer selected insurer to provide supplemental disability insurance and referring to plan as the "Residents' Supplemental Disability Insurance Plan" and the "Residents' Plan" showed endorsement by employer).

At the same time,

> as the regulation itself indicates, remaining neutral does not require an employer to build a moat around a program or to separate itself from all aspects of program administration. Thus, as long as the employer merely advises employees of the availability of group insurance, accepts payroll deductions, passes them on to the insurer, and performs other ministerial tasks that assist the insurer in publicizing the program, it will not be deemed to have endorsed the program under section 2510.3–1(j)(3).  It is only when an employer purposes to do more, and takes substantial steps in that direction, that it offends the ideal of employer neutrality and brings ERISA into the picture.

*Johnson v. Watts Regulator Co.*, 63 F.3d 1129, 1134 (1st Cir. 1995) (citations omitted).

Therefore,

> an employer will be said to have endorsed a program within the purview of the Secretary's safe harbor regulation if, in light of all the surrounding facts and circumstances, an objectively reasonable employee would conclude on the basis of the employer's actions that the employer had not merely facilitated the program's availability but had exercised control over it or made it appear to be part and parcel of the company's own benefit package.

*Id.* at 1135; *see McCann*, 921 F. Supp. 2d at 366 ("Other courts in this circuit have looked to the First Circuit's decision in *Johnson v. Watts Regulator Co.* for guidance."); *Letner*, 203 F. Supp. 2d at 1302 n.8 ("Many courts rely heavily upon the First Circuit's decision in *Johnson . . . .*").

Paul Revere argues that Spencer Stuart endorsed the Policy by assuming responsibility for payment of the premiums and obtaining a 35% discount.  According to Paul Revere, "[t]o suggest that 89 employees coincidentally obtained Paul Revere's individual disability policies without 'endorsement' of Spencer Stuart asks this Court to draw an unreasonable inference."  (Def.'s Reply at 9.)  As stated above, however, Paul

16

Revere does not dispute that Christoff in fact paid all of the premiums for the Policy. It is undisputed that Spencer Stuart did not pay any portion of these premiums. (*See* Frank Aff. ¶ 4.) The undisputed evidence in the record is that Spencer Stuart agreed to deduct the premiums from employee earnings and remit them to Paul Revere. (Frank. Aff. ¶ 4.)

In addition, Christoff correctly points out that "Paul Revere has offered no evidence that Spencer Stuart exercised any control over the individual policy or that it touted it as part of Spencer Stuart's 'plan.'" (Pl.'s Reply at 8.) There is no contention that Spencer Stuart promoted the Policy. There is no contention that Spencer Stuart undertook the types of administrative activities demonstrating endorsement. Paul Revere has offered no authority in support of its argument that a threshold number of employees demonstrates endorsement by an employer for purposes of the safe-harbor exemption. Attributing the number of policies issued to endorsement by Spencer Stuart rather than mere availability is speculative absent any evidence that Spencer Stuart engaged in the types of activities courts find probative when considering whether "an objectively reasonable employee would conclude . . . that the employer had not merely facilitated the program's availability but had exercised control over it or made it appear to be part and parcel of the [employer's] own benefit package." *Johnson*, 63 F.3d at 1135.

"[W]here an employer limits its administrative activities to collecting and remitting premiums, and other ministerial activities, courts have held that the employer does not endorse the program." *Tomes*, 2014 WL 2690938, at *5; *accord Johnson*, 63 F.3d at 1134 ("[A]s long as the employer merely advises employees of the availability of group insurance, accepts payroll deductions, passes them on to the insurer, and performs other

17

ministerial tasks that assist the insurer in publicizing the program, it will not be deemed to have endorsed the program."); *Letner*, 203 F. Supp. 2d at 1302 (no endorsement where employer's "role was limited to the administrative task of implementing the payroll deduction").   Here, the evidence shows that, notwithstanding the representation in the application that Spencer Stuart would be 100% responsible for payment of the premiums, "the only task [Spencer Stuart] performed in conjunction with the Policy was to serve as a conduit for premium payments" between its employees and Paul Revere.  *Healy*, 2012 WL 566759, at *6; *accord Schwartz v. Provident Life & Accident Ins. Co.*, 280 F. Supp. 2d 937, 943 (D. Ariz. 2003) (employer "served no function other than that of a conduit" where employer "did nothing more than transmit insurance premiums to the defendant under the list billing arrangement and inform the defendant when one of the insureds left" (quotation omitted)).

Based on the evidence in the record, Spencer Stuart did nothing more than advise its employees of the availability of optional, supplemental disability insurance with Paul Revere and facilitate the payment of premiums with payroll deductions.   Such limited involvement is insufficient to show endorsement.  *Rubin v. Guardian Life Ins. Co. of Am.*, 174 F. Supp. 2d 1111, 1118 (D. Or. 2001) ("By doing nothing more than advising employees of an option to purchase discounted disability insurance, and then accepting payroll deductions for employees who voluntarily purchase the coverage, [the employer] cannot be said to have moved beyond a status of 'employer neutrality' regarding this insurance option."); *see, e.g.*, *Johnson*, 63 F.3d at 1136; *Gooden*, 181 F. Supp. 3d at 477-78; *Tomes*, 2014 WL 2690938, at *5; *Healy*, 2012 WL 566759, at *6; *Schwartz*, 280 F.

18

Supp. 2d at 943; *Letner*, 203 F. Supp. 2d at 1302. Therefore, the third safe-harbor element is satisfied.

### c. Summary

As stated above, all four elements of 29 C.F.R. § 2510.3-1(j)'s safe-harbor criteria must be present if the Policy is to be exempt from ERISA. *See Ibson*, 776 F.3d at 945. Of the two criteria in dispute, the Court has concluded that a fact question remains as to whether Spencer Stuart contributed to the Policy. *See* 29 C.F.R. § 2510.3-1(j)(1). Therefore, the Court recommends that the parties' motions be denied with respect to the safe-harbor criteria, and proceeds to address the fundamental question of whether the Policy constituted an employee welfare benefit plan established or maintained by Spencer Stuart.

### 2. Administrative Scheme

In order for an employee welfare benefit plan to be governed by ERISA, it must be "established or maintained" by the employer. 29 U.S.C. § 1002(1); *see Lanpher v. Unum Life Ins. Co. of Am.*, No. 14-cv-2560 (JRT/HB), 2015 WL 5157519, at *5 (D. Minn. Sept. 2, 2015) ("The Court must also consider whether an employer conducts activities that constitute the establishment or maintenance of an employee welfare benefit plan."). The safe-harbor regulation "describes when and to what extent an employer may be involved with an employee welfare benefit program without being deemed to have established or maintained it." *McCann*, 921 F. Supp. 2d at 364. Satisfaction of the safe-harbor regulation means that the plan at issue has not been established or maintained by the employer and is thus exempt from ERISA. *Johnson*, 63 F.3d at 1133; *D'Elia*, 223 F. Supp. 3d at 389 n.56;

*see Ibson*, 776 F.3d at 944-45.  Yet, "a p[lan] that fails to satisfy the regulation's standards is not automatically deemed to have been 'established or maintained' by the employer," and is subject to further analysis.  *Johnson*, 63 F.3d at 1133; *accord Casselman*, 143 F. App'x at 510 n.1 ("Although a plan that satisfies the provisions of the safe harbor is necessarily excluded from coverage under ERISA, an insurance plan that does *not* fall within the safe harbor may still fail to qualify as a plan covered by ERISA."); *Butero*, 174 F.3d at 1214 ("So the safe harbor is barred.  But that does not necessarily mean that the insurance policy is part of an ERISA plan."); *D'Elia*, 223 F. Supp. 3d at 389 n.56 ("But a determination that the Safe Harbor criteria are not satisfied does not compel the conclusion that the claim is governed by ERISA"); *McCann*, 921 F. Supp. 2d at 364 (same).

"The pivotal inquiry is whether the plan requires the establishment of a separate, ongoing administrative scheme to administer the plan's benefits." *Kulinski*, 21 F.3d at 257; *see Eide*, 329 F.3d at 605 ("Whether an ERISA plan exists, or whether benefits are premised on an ERISA plan, may be determined by whether the employer requires 'an ongoing administrative program to meet [its] obligation.'" (alteration in original) (quoting *Fort Halifax Packing Co.*, 482 U.S. at 12)).  "If such a scheme is necessary, then an employee benefit plan falls within the preemptive scope of ERISA." *Rosati v. Cleveland-Cliffs, Inc.*, 259 F. Supp. 2d 861, 869 (D. Minn. 2003).

"Simple or mechanical determinations do not necessarily require the establishment of . . . an administrative scheme; rather, an employer's need to create an administrative system may arise where the employer, to determine the employee's eligibility for and level of benefits, must analyze each employee's particular circumstances in light of the

20

appropriate criteria." *Kulinski*, 21 F.3d at 257; *accord Miller v. Starkey Labs., Inc.*, 299 F. Supp. 3d 1046, 1053 (D. Minn. 2018); *Lanpher*, 2015 WL 5157519, at *5. "It is these 'types of discretionary decisions, such as evaluating eligibility criteria or determining benefit levels, that are indications of a true ERISA plan.'" *Lanpher*, 2015 WL 5157519, at *5 (quoting *Wright Elec., Inc. v. Minn. State Bd. of Elec.*, No. 00-cv-1457 (JRT/FLN), 2002 WL 511453, at *5 (D. Minn. Mar. 31, 2002)).

Paul Revere argues that Spencer Stuart "engaged in an ongoing and long-standing administrative scheme" with respect to the Policy because, under the ESP, "Spencer Stuart maintained '100%' responsibility for the payment of [Christoff's] policy premiums, obtaining reimbursement for its payment of premiums through payroll reductions, decision-making related to those premiums, and the receipt of all notices related to Policy premiums."[5]  (Def.'s Mem. in Supp. at 8.)  Christoff responds that "all [Spencer Stuart] had to do was deduct premiums and remit a check; no administration, such as a case-by-case analysis, or the exercise of discretion was needed."  (Pl.'s Mem. in Supp. at 13.)

Paul Revere further contends that *Johnston* is applicable here.  In *Johnston*, the Eighth Circuit Court of Appeals considered whether an individual long-term disability policy was an employee welfare benefit plan within the meaning of ERISA.  241 F.3d at 626, 629.  The employer arranged for eligible employees to meet with an insurance agent, "who explained plan benefits and completed the necessary enrollment forms."  *Id.* at 626.  "Employees were given the choice of paying the premiums themselves or having [the

---

[5] To the extent Paul Revere argues that Spencer Stuart determined which employees were eligible to apply for the Paul Revere policies, (Def.'s Reply at 10-11), such argument is based on the unidentified proposal documents attached to the Mugford Affidavit, which are not part of the record for purposes of these motions.  *See supra* n.3.

employer] make their payments." *Id.* "To facilitate payment, [the employer] was billed for monthly premiums, would pay the premiums in a lump sum, and then add the amount of each employee's individual premium to the employee's W-2 form at the end of the tax year." *Id.*

The Eighth Circuit concluded that the employer "did establish a plan within the meaning of ERISA that offered disability benefits to its employees." *Id.* at 629. "Because [the employer] engaged in the ongoing administration of the plan by assisting in the application process, by maintaining the policy forms, by processing paperwork in conjunction with [the insurance agent], and by facilitating the payment of premiums, the plan embodied a set of administrative practices." *Id.*

Other courts have similarly found establishment or maintenance of an employee welfare benefit plan when an employer not only facilitated the payment of premiums but was also actively involved elsewhere, including assisting with applications, processing paperwork, and soliciting enrollment. *See, e.g.*, *Butero*, 174 F.3d at 1214 (finding establishment where employer "consulted an insurance agent, selected the terms of the group policy it wished to purchase for its employees, completed an application form for the policy, solicited enrollments from its employees, collected money through payroll deductions, and remitted premium checks to [insurer]"); *Boles*, 847 F. Supp. 2d at 1166 (concluding employer maintained plan when it "engaged in the ongoing administration of the plan using a FlexBill option to provide several non-owner employees with insurance policies, by processing paperwork in conjunction with the policies, and by facilitating, and paying, policy premiums"); *Parrington v. Unum Provident Corp.*, No. 07-5089, 2008 WL

4006907, at *4 (W.D. Ark. Aug. 26, 2008) (holding employer established and maintained plan when it "engaged in the ongoing administration of the Plan by assisting in the application process, by maintaining policy forms, by processing paperwork in conjunction with Defendants, and by facilitating the payment of premiums").

Some courts have found establishment or maintenance of a plan with considerably less employer involvement, including based on the employer's engagement of an insurance broker, *see, e.g., McCann*, 921 F. Supp. 2d at 369 ("The Hospital assumed some responsibility for the administration of the plan by engaging LEI as a broker, to contact Residents and make them aware of the opportunity to purchase supplemental insurance under the [plan]."), and "receipt of premium notice statements and payment of premiums on behalf of its employees," *Harding*, 809 F. Supp. 2d at 416; *see D'Elia*, 223 F. Supp. 3d at 391 ("[A] request made on an insurance application that premium notices be mailed to the employer provides further evidence that the employer established or maintained the plan.").

The instant case bears some similarity to *Johnston*. Here, similar to the employer in *Johnston*, Spencer Stuart made individual disability polices available to its employees and facilitated the payment of premiums by deducting them from employee earnings and remitting them to Paul Revere. But, unlike the employer in *Johnston*, there is no evidence in the record that Spencer Stuart adjusted employee tax returns to account for the premium payments. *See* 241 F.3d at 626; *Lanpher*, 2015 WL 5157519, at *7. And, unlike the employer in *Johnston* and other more "active" employer cases, there is no evidence in the record that Spencer Stuart played an active role in the application process or in processing

paperwork in conjunction with the Policy.  *See* 241 F.3d at 626, 629; *Lanpher*, 2015 WL 5157519, at *6-7; *see also, e.g.*, *Butero*, 174 F.3d at 1214; *Boles*, 847 F. Supp. 2d at 1166; *Parrington*, 2008 WL 4006907, at *4.

Rather, Spencer Stuart was far less involved in the administration of the Policy, bringing the instant case more in line with *Lanpher*.  With respect to the disability insurance policy at issue in *Lanpher*, the employer was not involved in the "application process[] as the employees [who purchased the policies] submitted their applications directly to [the insurer]."  2015 WL 5157519, at *6.  The employer did not "have any control over the employees' benefit levels."  *Id.*  The employer did "orchestrate[] some aspects of the [p]olicy's administration."  *Id.* at *2.  The employer "facilitated the employees' premium payments, in exchange for which [the insurer] offered the three employees a 15% discount on their premiums through a Flexbill benefit arrangement."  *Id.*  Under this arrangement, the bills for the entire group were sent to the employer; the employer "passed the bills on to the employees"; and each employee "paid his own premium directly to [the insurer]."  *Id.*

The district court concluded that the employer did not establish or maintain an employee welfare benefit plan.  *Id.* at *6-7.  While the insurer "argue[d] that the FlexBill system required administrative action by [the employer], . . . there [wa]s no evidence that the FlexBill arrangement required [the employer] to exercise discretion over any aspect of the [p]olicy."  *Id.* at *6.  The employer "merely received the bills from [the insurer], to which [the insurer] had already applied a 15% discount, and then passed the premium bills on directly to the employees without taking any other administrative actions."  *Id.*

"Nothing in the record indicate[d] that [the employer] undertook any financial obligations with respect to the [p]olicy, received any material benefit from [the insurer] for facilitating premium bills, or engaged in any practices beyond automatic forwarding of bills immediately to employees."  *Id.*  The district court concluded that "[s]uch limited involvement 'hardly constitutes the operation of a benefit plan' by [the employer]."  *Id.* (quoting *Fort Halifax Packing Co.*, 482 U.S. at 12).

As in this case, the insurer in *Lanpher* also urged the district court to "find the establishment of an ERISA plan where the employer's only role was facilitating premium payments for which the employees were ultimately charged" based on *Johnston*.  *Id.* Recognizing that the plaintiff-insured "w[as] personally responsible for the cost of the premiums" in *Johnston* and the case before it, the district court found the employer's involvement in each distinguishable.  *Id.* at *6-7.  The employer in *Johnston* had reached out to an insurance agent to secure a new provider for its employees and "work[ed] with the insurance agent to handle policy paperwork and institut[e] a policy whereby the employer would pay premiums up front and then adjust the employees' tax forms."  *Id.* at *7.  In contrast, the employees in the case before the district court heard about the insurance policy through a presentation by the insurer directed at the employer's clients, not the employees themselves.  *Id.* at *2.  And, when compared to *Johnston*, the employer was "far less involved in the administration of the . . . [p]olicy."  *Id.* at *7.  The district court therefore concluded that the employer's activities "did not reach the threshold of establishing or maintaining an ERISA employee welfare benefit plan."  *Id.*

Distilled to its essence, Paul Revere argues that "the policy at issue is governed by ERISA because it is part of a plan established and maintained by Spencer Stuart providing disability benefits to [Christoff] and the other employees in the ESP through individual policies funded by premium discounts and payroll deductions handled on an ongoing basis by Spencer Stuart."  (Def.'s Reply at 14.)  It is true that Spencer Stuart had a greater role in making the optional supplemental disability coverage available to its employees than the employer in *Lanpher*.  But, it is well settled that simply making a benefit available to employees does not constitute the establishment or maintenance of an employee welfare benefit plan.  *Kulinski*, 21 F.3d at 256; *Eide*, 329 F.3d at 605; *Lanpher*, 2015 WL 5157519, at *5; *Healy*, 2012 WL 566759, at *8.

Here, Spencer Stuart did not assist with the application, process paperwork, solicit enrollment, or adjust employee tax returns to account for premium payments.  Paul Revere does not contend that Spencer Stuart's purported administrative involvement extended beyond facilitating the payment of premiums.  The same was true in *Lanpher*.  As in *Lanpher*, there is no evidence that the deduction and remittance of premium payments required Spencer Stuart to exercise discretion over the Policy.  Therefore, acknowledging that reasonable jurists have disagreed, the Court concludes based on the weight of the authority that the limited involvement of Spencer Stuart in selecting an insurer and facilitating the payment of premiums is not sufficient to establish or maintain an employee welfare benefit plan under ERISA.  *Lanpher*, 2015 WL 5157519, at *6-7; *Healy*, 2012 WL 566759, at *8; *see Matthew v. Unum Life Ins. Co. of Am.*, No. 08-cv-4610 (DWF/RLE), 2009 WL 3152042, at *5 n.2 (D. Minn. Sept. 24, 2009) ("[T]he Court finds unpersuasive

26

[the insurer's] arguments regarding [the employer's] administrative involvement in advancing premiums through the list-billing procedure. [The employer's] ministerial acts are not sufficient to demonstrate a scheme to administer benefits."). *But see McCann*, 921 F. Supp. 2d at 368-39; *Harding*, 809 F. Supp.2d at 416.

Because Spencer Stuart's activities did not reach the threshold of establishing or maintaining an employee welfare benefit plan, Christoff's claims challenging the termination of benefits under the Policy are not preempted by ERISA. Accordingly, the Court recommends that Paul Revere's motion for summary judgment be denied in its entirety, Christoff's motion for partial summary judgment be granted in part, and Christoff be permitted to proceed with his claims as pleaded.

[Continued on next page.]

## IV. RECOMMENDATION

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED** that:

1. Paul Revere's Motion for Summary Judgment (ECF No. 9) **BE DENIED**.

2. Christoff's Motion for Partial Summary Judgment (ECF No. 22) **BE DENIED IN PART** and **GRANTED IN PART**.


Date: July___26___, 2018                    _____*s/ Tony N. Leung*_____
                                            Tony N. Leung
                                            United States Magistrate Judge
                                            for the District of Minnesota


*Christoff v. Paul Revere Life Insurance Company*
Case No. 17-cv-3515 (JRT/TNL)


## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).